Filed 8/22/24

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| KAMILA MALINOWSKI,<br><br>         Plaintiff and Appellant,<br>v.<br><br>JUSTIN MARTIN,<br><br>         Defendant and Respondent. | A167187<br><br>(San Mateo County<br>Super. Ct. No. 21-FAM-01531) |

Kamila Malinowski appeals from the trial court's denial of her request to include her two children as protected parties under an existing domestic violence restraining order (DVRO) under the Domestic Violence Prevention Act (DVPA; Fam. Code, § 6200 et seq.)[1] against the children's father, Justin Martin. Malinowski claims that Martin abused the children during several visitation exchanges in 2021, and that these events, along with the children's reports of other alleged abuse, were captured on video by a vehicle "dash cam." Among other things, Malinowski contends the dash cam videos were erroneously excluded at trial because the videos did not, as the trial court found, record "confidential communications" within the meaning of the California Invasion of Privacy Act (Privacy Act; Pen. Code, § 630 et seq.), and

---

*       Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A.5., B., C., and D. of the Discussion.

[1]       Further unspecified statutory references are to this code.

1

because the recordings were otherwise permitted under statutory exceptions to the Privacy Act (Pen. Code, §§ 633.5 and 633.6).

In the published portion of this opinion, we conclude that although the statutory exceptions of Penal Code sections 633.5 and 633.6 were inapplicable on the record presented below, the trial court erred in ruling that the dash cam videos captured Martin's confidential communications with the children in violation of the Privacy Act. In the unpublished portion of this opinion, we conclude the trial court's Privacy Act error was harmless, and we reject Malinowski's other claims of error. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

This case has a complicated history in the lower court, as well as a prior appeal in this court (*Malinowski v. Martin* (2023) 93 Cal.App.5th 681 (*Malinowski*)). We will first provide a general summary of events, adapted in part from our prior decision in *Malinowski*. Additional background facts relevant to the contentions on appeal will be set forth in the applicable sections of the Discussion, *post*.

### A. Marriage, Dissolution, and First DVPA Case

Malinowski and Martin were married in September 2013. They have two children, I.M. and J.M.

In September 2018, Malinowski filed for dissolution of marriage (case No. 18-FAM-02115). That same day, she obtained a domestic violence temporary restraining order (DVTRO) against Martin protecting herself, I.M. and J.M. (ages 3 and 1 at the time), and her parents (case No. 18-FAM-02115-A).

### B. Elder Abuse Restraining Order

In a separate case (case No. 18-PRO-01021), Malinowski's parents obtained a three-year elder abuse restraining order against Martin. In

January 2019, the trial court found by clear and convincing evidence that Martin committed elder abuse against Malinowski's father (hereafter Grandfather) and ordered Martin to, among other things, stay 100 yards from Malinowski's parents.[2]

### C. Early Custody and Visitation Orders

In the dissolution matter, the family court appointed Dr. Robin Press to perform a full child custody evaluation. The court also granted Martin supervised visitation with the children.

### D. First DVPA Trial

Meanwhile, the trial court in the DVPA action held a trial in October 2020. At the conclusion of testimony, the court announced its decision to issue a three-year DVRO protecting Malinowski from Martin, finding "there were incidences of domestic violence in all of the testimony going back to 2015 or somewhere in that nature." However, the court elected not to include Malinowski's parents or the children as protected parties because the grandparents had "their own restraining order," and the children were adequately protected in the "hands-on family law action currently pending."[3]

Two items of the October 2020 DVRO are noteworthy. First, it contained an exception to the personal conduct and stay-away orders for Martin's "peaceful contact with children . . . as required for court-ordered visitation of children." Second, the October 2020 DVRO checked a box

---

[2]     In February 2022, the elder abuse restraining order was renewed for five years.

[3]     The trial court instructed Malinowski's counsel to prepare and file a formal order. For whatever reason, the DVRO was not filed until May 2021. To avoid confusion regarding the chronology of events, we will refer to this DVRO as the "October 2020 DVRO."

3

permitting Malinowski "to record communications made by [Martin] that violate the judge's orders."

**E. Family Court Hearings Regarding Visitation and Exchanges**

Back in the family court proceedings, the Honorable Sean P. Dabel conducted a March 2021 hearing and heard testimony from supervised visitation provider Julie Espinoza. Judge Dabel changed Martin's visitation status from supervised to unsupervised but ordered that the exchanges of the children be supervised by Espinoza. Judge Dabel instructed Espinoza "to take notes as to what's going on with these kids and what they are saying," noting that it "is a benefit to the father and a benefit to the Court" to have her document the events in order to understand the basis for the children's resistance to visitation. Judge Dabel further remarked that supervised exchanges would allow the court to "gain information about how these parents are interacting and how the children, then, are provided to the father."

In July 2021, Judge Dabel held an evidentiary hearing on, among other matters, Martin's request for increased visitation hours and his claim that Malinowski was interfering with visitation. Espinoza testified that since she had begun supervising exchanges in March 2021, the children had refused to go on approximately one-third to one-half of the visits, claiming Martin had hit them, and that their mother had told them they could not go. Espinoza said she had never observed Martin inappropriately handle the children.

Espinoza's testimony then turned to several events that would become the subject of Malinowski's second DVPA action from which this appeal lies. We will briefly mention them now.

Espinoza was examined about an exchange on June 14, 2021, in which Martin allegedly drove away with only J.M. and left I.M. alone in a parking

lot. As Espinoza explained, "if I step away and leave the kids alone with Dad, they will go on the visit. So I parked about 20 yards away, and I'm watching the situation happen. [J.M.] gets out of the car. The kids are getting in and out of the car, running around the car, getting back in the car, getting out of the car. [¶] One of the times while [J.M.] is out of the car, Dad scoops him up and puts him into his vehicle. [I.M.] is calling for [J.M.], and [J.M.] is saying that he wants [I.M.] to go. I am close enough so I can hear them. Dad goes back to the car. I can see him talk with [I.M.], and then he walks away, gets in his car, and he drives away. As he's driving away, I'm getting out of my vehicle, walking towards [I.M.], who is in the vehicle. Grandfather is across the street. . . . [¶] [I.M.] gets out of the car. She's not in distress. And Grandpa starts walking over, and I tell Grandpa that [I.M.] has been very naughty today. And Grandpa tells her in a really firm voice 'You are no good.' [I.M.] bursts into tears and runs back to the car."

Espinoza further testified that during another supervised exchange, Martin told J.M. that if he did not come on the visit to take care of his pet fish, Martin would flush the fish down the toilet. Espinoza admonished Martin for this remark.

Espinoza was asked by Malinowski's counsel, Diane Morin, about an incident on June 1, 2021, in which Martin allegedly told I.M. that she could go to jail for six-year-olds for lying. Espinoza testified that she did not recall this remark and that it did not appear in her written report. When Morin attempted to refresh Espinoza's recollection, Judge Dabel asked Morin what document she would be using. Morin responded, "it's not a document" and indicated there were video recordings of the children exchanges that Espinoza supervised. Morin continued, "So my question to Ms. Espinoza is simply isn't it true that on June 1st, 2021, the father gets upset and says to

5

his daughter . . . that he will call the police on her; she will go to jail; the jail is just next to them; and there are jails for six-year-olds?" Espinoza responded, "I do not know. As she stated, the visits are recorded, and once Dad is with the kids, I may not necessarily be there because that's his parental time. So conversations may have happened with the kids that I was not privy to because I had stepped away."[4]

Espinoza provided further testimony on allegations that the children sometimes waited in the car for hours during exchanges; that she once had J.M. lift up his shirt to show where I.M. had kicked him; that the children sometimes urinated on themselves during the exchanges; and that J.M. was once bitten by a turtle during a visit with Martin.

After the conclusion of testimony, Judge Dabel announced his decision to increase Martin's visitation hours. Though Judge Dabel admonished Martin for threatening to flush J.M.'s fish down the toilet, he also admonished Malinowski for telling the children that visitation should not go forward and expressed his "deep suspicion" that Malinowski was not encouraging visits and alienating the children from Martin. On July 13, 2021, Judge Dabel issued a written order increasing Martin's visitation with the children to 15 hours per week, with the exchanges to be supervised by Espinoza.

### F. Second DVPA Petition

On September 14, 2021, Malinowski filed a second DVPA petition (case No. 21-FAM-101531) seeking a DVRO to protect herself and the children from Martin. In a supporting declaration, Malinowski alleged that Martin

---

[4]    We may reasonably assume, based on context, that Espinoza meant to say the *exchanges* were recorded, as Espinoza was referring to what Morin had just previously told the court.

had committed the following nine instances of abuse against the children in 2021: (1) on April 3, the children returned from a visit reporting that Martin had pulled J.M. by the wrists and locked I.M. in another room; (2) on April 8, upon returning from a visit, I.M. reported that Martin allowed J.M. to leave the residence unattended, and J.M. thereafter fell and sustained a concussion; (3) on May 13, the children returned from a visit reporting that Martin had punched J.M. in the chest at the front gate of Martin's property; (4) on May 17, upon returning from a visit, J.M. reported that Martin hit him in the shoulder and said " 'Fuck you, [J.M.]' "; (5) during an exchange on May 24, Martin threatened to kill J.M.'s fish if he did not agree to a visit; (6) during an exchange on June 1, Martin threatened to send I.M. to "jail for six-year-olds"; (7) on June 3, J.M. reported to school personnel that his father had punched him in the chest while yelling, " 'Fuck you, [J.M.]' "; (8) during an exchange on June 14, Martin took a crying J.M. and drove away, abandoning I.M. in the parking lot; and (9) on August 9, after an unsupervised visit, I.M. reported that " 'Daddy tried to punch my head' " and " 'Daddy said he will make me dead.' " (Italics omitted.)

The trial court immediately issued a DVTRO against Martin that included the children as protected persons and contained no-contact and stay-away orders, with no exceptions. (*Malinowski, supra*, 93 Cal.App.5th at p. 686.) As a result, Martin's visitation with the children ceased for several months. (*Id.* at p. 687.)

After the DVPA case was assigned for all purposes to Judge Dabel, Malinowski filed a successful peremptory challenge under Code of Civil Procedure section 170.6. (*Malinowski, supra*, 93 Cal.App.5th at p. 687.) The matter was then reassigned several times until both the second DVPA matter and the dissolution case were assigned to one trial court judge. (*Id.* at

7

pp. 687–688.)  In March 2022, the court explained that after having become fully acquainted with the case, including Judge Dabel's prior orders allowing Martin unsupervised visits and increasing his visitation hours, it would modify the DVTRO to contain exceptions for brief and peaceful contact for court-ordered visitation.  (*Id.* at p. 689.)  In *Malinowski*, we affirmed the trial court's order, concluding it was not required to follow the procedures of Code of Civil Procedure section 533 in order to modify the DVTRO to allow for exceptions consistent with child visitation ordered in the parallel dissolution case.  (*Malinowski*, at p. 685.)

**G. Second DVPA Trial**

The second DVPA trial was held in October 2022.  In her amended exhibit list submitted before trial, Malinowski identified several exhibits as video clips of the alleged abuse.  She also identified several exhibits collectively as "Video transcript of abuse."[5]

Both parties filed motions in limine.  Martin's motion in limine no. 7 sought to exclude the children from testifying at trial.  The trial court granted that motion, and Malinowski does not challenge that ruling on appeal.

Malinowski's motion in limine no. 2 sought to admit video footage of the supervised exchanges captured by a vehicle dash cam, while Martin's motion in limine no. 5 sought to exclude the "secretly-obtained unlawful recordings." The trial court granted Martin's motion to exclude the dash cam evidence.

Over the course of nine days, the trial court heard testimony from Malinowski; the children's therapist, Valerie Houghton; the visitation exchange supervisor, Espinoza; Malinowski's private investigator, Cliff

---

[5]     The videos are not in the record.  The transcript of the videos, which appears to have been prepared by Malinowski, is in the record, and we discuss it in detail in part A.5. of the Discussion, *post*.

Jorgensen; Grandfather; and Martin. After closing arguments, the court issued its oral ruling denying Malinowski's request to add the children as protected parties to the DVRO.

Malinowski requested a statement of decision, and in December 2022, the trial court issued a written decision finding that Martin "did not commit the alleged acts of domestic violence or abuse against the minor children." The court noted that Judge Dabel had previously conducted a hearing in "March 2021" addressing many of the same allegations raised here, and, like Judge Dabel, the court found that Espinoza was "an objective observer of the exchanges" and "a credible witness," and that "she represented the voice of sanity amidst all the chaos." The court further found that Espinoza "was met with roadblocks erected by" Malinowski and Grandfather.

The trial court did not "find reliable the opinion testimony of the children's therapist Valerie Houghton that, based upon what Ms. Houghton described as a 'convergence of data,' the children were telling the truth when they reported to her acts of abuse by their father." The court further emphasized that Houghton had never spoken directly to either Martin or Espinoza about the children's reports.

The trial court also found that Malinowski's testimony about the children's reports of abuse and her observed symptoms of alleged abuse was unreliable, as Malinowski "was not a personal witness to any of the alleged abuse perpetrated by [Martin] and thus, had no personal knowledge of any such abuse. The evidence, in toto, does not support any of the allegations of abuse of the children by [Martin]."

Based on these findings, the trial court denied Malinowski's request to add the children to the existing DVRO and ordered "the immediate

9

implementation of the 120 day recommendation contained in the Child Custody Evaluation."

This appeal followed.

## DISCUSSION

Under the DVPA, the trial court may issue a restraining order "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) "Abuse" under the DVPA includes intentionally causing or attempting to cause bodily injury, and "plac[ing] a person in reasonable apprehension of imminent serious bodily injury to that person or to another." (§ 6203, subd. (a)(1), (3).) Section 6203 "broadly provides that 'disturbing the peace of the other party' constitutes abuse for purposes of the DVPA." (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*); see §§ 6203, subd. (a)(4), and 6320, subd. (c).) The court must "consider the totality of the circumstances in determining whether to grant or deny a petition for relief." (§ 6301, subd. (c).)

### A. Exclusion of Dash Cam Footage

In considering Malinowski's request to add the children to the existing DVRO, the trial court excluded Malinowski's dash cam videos on the ground that they recorded Martin's confidential communications with the children in violation of the Privacy Act (Pen. Code, § 632). Malinowski contends this was a prejudicial evidentiary error, as Martin "could have no objectively reasonable expectation that things he said and did at the supervised exchanges would not be overheard due to both prior court orders and the public nature of the exchange location."

### 1. *Additional Background Facts*

In her motion in limine no. 2, Malinowski argued the dash cam recordings were admissible because (1) the October 2020 DVRO authorized her to record violations of the trial court's orders; (2) no "confidential communications" were captured given the public nature of the exchange location; and (3) the recordings fell within the exceptions to the Privacy Act under Penal Code sections 633.5 and 633.6.

Martin meanwhile argued the videos should be excluded from evidence because they were unlawfully obtained without his and Espinoza's express consent, and because Malinowski was not recording the exchanges with a reasonable belief in obtaining evidence of felony child abuse, as there has never been a finding of his domestic violence against the children, and the children were not the subject of any protective order. Martin also complained that Malinowski had refused to produce the videos until the eve of trial "despite multiple requests . . . going back to April/May 2021."

During argument on these motions, Martin's counsel additionally contended that the videos were more prejudicial than probative, as Malinowski had admitted she edited the video clips. Malinowski's counsel acknowledged that edited versions of the dash cam videos had been sent to Houghton for her review, but he insisted the videos offered as trial exhibits were complete and unedited. Additionally, Malinowski's counsel reiterated a previous request for a hearing under Evidence Code section 402.

The trial court declined to admit the video evidence, finding that Martin had a reasonable expectation of not being recorded or overheard at the supervised exchanges of the children, and that therefore the recordings were made "in violation of Penal Code [section] 632." The court further remarked that Espinoza "is the best evidence in regards to the nature of the

11

exchange. And so the dashcam footage, which the Court also has concerns about in terms of its completeness, is also an undue use of the Court's time when we have a witness who will be present to testify about those exchanges."

During the course of the trial, Malinowski provided general testimony on how the exchanges were conducted and the nature of the location in which they were held. As she explained, Grandfather would drive the children to a public parking lot to meet Espinoza. The parking lot was adjacent to various buildings, including a bank, a city council building, and a police station. Once Espinoza removed the children from the car, Grandfather would wait across the street—a step necessitated by the fact that the elder abuse restraining order against Martin was still in place. After confirming that Grandfather was across the street, Espinoza would contact Martin and instruct him to come pick up the children. If the children agreed to go with Martin, Espinoza would inform Grandfather the exchange was successful. If the children refused, Espinoza would call for Grandfather to return to the parking lot and take the children home.

Espinoza testified her role as exchange supervisor was " 'to observe, monitor, and document,' " as well as to keep the children safe. According to Espinoza, the children were often loud and unruly during the exchanges, which attracted the attention of bystanders. Once Martin arrived at the exchange location, Espinoza would sometimes drive to another part of the parking lot and supervise the interaction from a distance.

Private investigator Jorgensen testified that Malinowski hired him to surveil an exchange on April 19, 2021. He took photographs and videos showing, among other things, I.M. screaming and climbing on top of an SUV. Espinoza testified she did not know a private investigator was watching, but

12

she often had the feeling of being watched "in addition to the cameras inside Mom's car."[6]  She further testified that Grandfather sometimes hid in the bushes and watched the exchange through binoculars.

### 2. *Governing Law*

A trial court's ruling on a motion in limine is generally reviewed for abuse of discretion, but where, as here, the issue is one of law, we exercise de novo review.  (*Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist.* (2007) 149 Cal.App.4th 1384, 1392.)

The Privacy Act bars the recording of a "confidential communication" without the consent of all parties to the communication.  (Pen. Code, § 632, subd. (a).)  A " 'confidential communication' means any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." (*Id.*, subd. (c).)  Evidence obtained in violation of this statute is not admissible in any judicial, administrative, legislative, or other proceeding.  (*Id.*, subd. (d).)[7]

"The test of confidentiality is objective."  (*Coulter v. Bank of America* (1994) 28 Cal.App.4th 923, 929.)  In *Flanagan v. Flanagan* (2002) 27 Cal.4th

---

[6]     We assume that by "Mom's car," Espinoza was referring to the vehicle Grandfather drove to the exchange.  We also note that the earliest date on which Espinoza testified noticing cameras in the car was May 17, 2021.

[7]     Those who violate Penal Code section 632 face fines, imprisonment, or both.  (Pen. Code, § 632, subd. (a).)  Additionally, any person who has been injured by a violation of the Privacy Act may bring a civil action against the violator for the greater of treble damages or a statutory penalty, as well as injunctive relief.  (Pen. Code, § 637.2.)

766 (*Flanagan*), the Supreme Court endorsed the test set forth in *Frio v. Superior Court* (1988) 203 Cal.App.3d 1480 (*Frio*) for determining the confidentiality of a communication: " '[U]nder section 632 "confidentiality" appears to require nothing more than the existence of a reasonable expectation by one of the parties that no one is "listening in" or overhearing the conversation.' " (*Flanagan*, at pp. 772–773, italics omitted.)

### 3. *Martin's Communications Were Not Confidential*

As set forth above, Penal Code section 632, subdivision (c), defines "confidential communications" in essentially two parts. The first clause generally defines what *is* confidential, while the second phrase explains what is *excluded* from the definition. We conclude communications made during visitation exchanges that have been ordered by a family court to be supervised do not meet the definition of "confidential communications" under the first clause of Penal Code section 632, subdivision (c). That is, such communications are not "carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." This is because a supervised exchange, by its very nature, involves the monitoring and documenting of the statements made by the participants. Espinoza's role as exchange supervisor was not simply to be present but to carefully observe the events and "take notes as to what's going on with these kids" so that the court could gain information about the interactions between Martin and the children." Where, as here, the exchanges were subject to formal oversight by Espinoza and ultimately the court, Martin could not reasonably expect that statements made during such exchanges would be confined just to those present.[8]

---

[8]     Our conclusion does not advance the disapproved test of *O'Laskey v. Sortino* (1990) 224 Cal.App.3d 241 (see *Flanagan, supra,* 27 Cal.4th at

14

We also conclude the communications in question fall within the exclusionary language in the second clause of Penal Code section 632, subdivision (c)—that is, "a communication made . . . in any . . . circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."  Here, the communications were made during supervised exchanges that took place in a public parking lot during daylight hours, and the parking lot was adjacent to businesses and public buildings.  Moreover, the conversations occurred in and around a vehicle that was not Martin's own, and the commotion during the exchanges often attracted the attention of bystanders.  Unlike other cases involving surreptitious recordings of telephone conversations (see, e.g., *Flanagan*, *supra*, 27 Cal.4th at p. 770; *Frio*, *supra*, 203 Cal.App.3d at pp. 1485–1486), the circumstances were such that the parties to the exchanges could reasonably expect their statements to be overheard at any time by members of the public who happened to be nearby.  At this juncture it bears emphasizing that both the statutory and decisional law state the test for confidentiality in the disjunctive—whether a communication may reasonably be expected to be "overheard *or* recorded."  (Pen. Code, § 632, subd. (c), italics added; *Flanagan*, *supra*, 27 Cal.4th at pp. 776–777, italics added.)

Additionally, we note there were indications in this case that both Espinoza and Martin were actually aware they were being recorded during the exchanges.  At various times during the proceedings below, Espinoza testified she knew of the camera in Malinowski's vehicle, including during a July 2021 family court hearing in which Martin was present.  Likewise,

pp. 768, 776, fn. 4), as we are not assessing confidentiality based on the *contents* of the statements made during the exchanges, but on the external circumstances in which the statements were made.

15

Martin's motion in limine no. 5 represented he had been requesting production of the videos since "April/May 2021." Taking Martin at his word, it stands to reason he knew the exchanges were being recorded from April 2021 onward. Though we need not decide whether his consent to the recordings may be implied from this circumstance (see *Rojas v. HSBC Card Services Inc.* (2023) 93 Cal.App.5th 860, 881), it is relevant to show that Martin could not reasonably believe the statements he made during the exchanges would be "confined to the parties thereto" and would not be "overheard or recorded." (Pen. Code, § 632, subd. (c).)

In sum, we conclude the trial court erred in finding that Malinowski recorded "confidential communications" in violation of Penal Code section 632.

### 4. Penal Code Sections 633.5 and 633.6

We will also address Malinowski's alternative contention that the dash cam recordings came within domestic violence exceptions to the Privacy Act's prohibitions under Penal Code sections 633.5 and 633.6. We do so in order to clarify the scope of these exceptions and discourage any potential abuses of their provisions.

We first address subdivision (a) of Penal Code section 633.6, which provides that a judge issuing a DVRO "may include a provision in the order that permits the victim to record any prohibited communication made to him or her by the perpetrator." Malinowski contends this statutory exception applies because the October 2020 DVRO permitted her to record communications "that violate the judge's orders." We disagree, as the only "prohibited communication" for purposes of the October 2020 DVRO was Martin's contact with Malinowski, the sole person protected under that restraining order. Significantly, the trial court intentionally excluded the

16

children as protected persons under the October 2020 DVRO, and Martin was otherwise permitted by the family and domestic violence courts to have contact with the children for purposes of visitation. Because Martin was allowed to have contact with the children, it cannot be said that his communications during the supervised exchanges were "prohibited" within the meaning of Penal Code section 633.6, subdivision (a). True, the October 2020 DVRO mentioned the children in specifying an exception to the no-contact and stay-away orders for Martin's "peaceful contact with children . . . as required for court-ordered visitation of children," but the court seemed to indicate its view that enforcement of the "peaceful contact" language was within the ambit of the family court, not the DVPA court. In short, because the October 2020 DVRO did not prohibit Martin's contacts with the children, it did not grant Malinowski permission to record their confidential communications.

Next, we turn to Penal Code section 633.6, subdivision (b), and section 633.5, both of which permit, under specified circumstances, the recording of confidential communications for purposes of evidence-gathering. Penal Code section 633.6, subdivision (b), provides that "a victim of domestic violence who is seeking a domestic violence restraining order from a court, and who reasonably believes that a confidential communication made to him or her by the perpetrator may contain evidence germane to that restraining order, may record that communication for the exclusive purpose and use of providing that evidence to the court." And as relevant here, Penal Code section 633.5 states that Penal Code section 632 does "not prohibit one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of" various enumerated crimes,

17

including "any felony involving violence against the person" such as "domestic violence as defined in [Penal Code] Section 13700."

As indicated, these statutes require a reasonable belief the recordings will result in evidence that is "germane" to an anticipated DVRO[9] (Pen. Code, § 633.6, subd. (b)) or that "relate[s]" to felony domestic violence (Pen. Code, § 633.5). In *In re Trever P.* (2017) 14 Cal.App.5th 486 (*Trever P.*), the court clarified that in order for a parent to make a surreptitious recording of their child with another for the purpose of gathering evidence of abuse, the parent must have "a good faith, objectively reasonable belief that the recording is in the best interest of the child." (*Trever P.*, at p. 501 [addressing Penal Code, § 633.5].)

We cannot conclude Malinowski has met *Trever P.*'s objective test. Malinowski began recording in or around March 2021 when the supervised exchanges first started. Notably, however, she identifies no specific facts from that time period demonstrating a good faith, objectively reasonable belief that recording the supervised exchanges would be in the children's best interest. Instead, she claims she had reasonable grounds for making the recordings because of Martin's "long history of being uncontrollably violent," which included death threats against her, the children, Grandfather, and Martin's own father.

---

[9] In *Br. C. v. Be. C.* (2024) 101 Cal.App.5th 259, the court explained that Penal Code section 633.6, subdivision (b)'s phrase "seeking a domestic violence restraining order from a court" does not require an *active* DVRO request at the time the confidential communications are recorded. Rather, a domestic violence victim may make the recording "so long as he or she intends to request a DVRO and reasonably believes that the communication may contain evidence germane to that request, regardless of whether a petition has yet been filed with a court." (*Br. C.*, at p. 266.)

18

We fully acknowledge that the allegations of Martin's prior domestic violence against Malinowski were examined and adjudicated in her favor in the first DVPA case, leading to the October 2020 DVRO, and that the allegations of abuse against Grandfather led to the elder abuse restraining order. While we do not intend to minimize or gloss over the gravity of these circumstances, it remains the case that the October 2020 DVRO did not include the children as protected parties, and the family court thereafter monitored the children's safety and gradually increased and elevated Martin's visitation status after holding evidentiary hearings that involved extensive examinations of Malinowski's claims of abuse. Given the children's exclusion from the original DVRO and the family court's subsequent determinations that evidence supported the increase of Martin's visitation status, we cannot conclude that Martin's violent history toward Malinowski and Grandfather compelled a finding that Malinowski had objectively reasonable grounds under Penal Code sections 633.5 and 633.6, subdivision (b), for recording Martin's communications with the children. Were we to hold otherwise, there would effectively be no limit on Malinowski's ability to record Martin's confidential communications with the children going forward. We decline to read the statutory exceptions so broadly.

As further support for her claim of an objectively reasonable belief, Malinowski highlights the children's on-camera accusations of abuse, in particular, I.M.'s recorded report in August 2021 that Martin said he would "make [her] dead." But of all the dash cam recordings allegedly reflecting acts or reports of abuse, the recorded August 2021 report occurred last in time and, accordingly, provides no basis—let alone an objectively reasonable one—for recording the supervised exchanges beginning in March 2021. Malinowski cites no authority for such an ends-justifies-the-means

19

interpretation of the reasonable belief requirement of Penal Code sections 633.5 and 633.6, subdivision (b), and we decline to endorse one.

Though we reject Malinowski's argument that Penal Code sections 633.5 and 633.6, subdivision (b), permitted her to make the dash cam recordings of the supervised exchanges for the purpose of evidence-gathering, we reiterate our holding that the trial court erred in concluding the dash cam videos captured confidential communications in violation of Penal Code section 632 and in excluding the evidence on that basis.

### 5. *Prejudice*

In determining whether the trial court's error was prejudicial, we must decide, based on "an examination of the entire cause, including the evidence" (Cal. Const., Art. VI, § 13), if it is reasonably probable that a result more favorable to Malinowski would have been reached in the absence of the error (*People v. Nakai* (2010) 183 Cal.App.4th 499, 519).

Having carefully examined the entire record in this case, including Malinowski's transcript of the dash cam recordings and the testimony and exhibits admitted at trial, we are satisfied that the erroneous exclusion of the dash cam evidence was harmless. Put another way, it is not reasonably probable that the admission of the dash cam footage would have led to the issuance of a DVRO protecting the children.

### a. On-Camera Accusations of Abuse

We begin by noting that only three of the 25 video clips identified in Malinowski's transcript purport to depict incidents of abuse by Martin.[10]

---

[10] The transcript contains separate entries for each alleged instance of abuse caught on video. In total, there are 25 separate clips of varying lengths, ranging from 44 seconds to 15 minutes, with most clips being several minutes long. At the top of each entry, the transcript provides a summary of the clip and identifies the "Video Date," "Video Start" (the time a particular

These are: (1) the May 24, 2021, video of Martin saying he would flush J.M.'s fish down the toilet; (2) the June 1, 2021, clip of Martin telling I.M. that six-year-olds can go to jail for lying; and (3) the June 14, 2021, clip of the exchange during which Martin allegedly abandoned I.M. in the parking lot. These incidents will be discussed, *post*, in part 5.b.

The remaining videos consist mostly of the children's on-camera accusations that Martin had previously committed acts of abuse against them. As such, these video clips were cumulative of other testimony admitted at trial regarding the children's reports of abuse. Malinowski testified at length regarding each of the children's reports in 2021 that Martin had pulled J.M. by the wrists and locked I.M. in another room in April; left J.M. unattended when he fell and suffered a concussion in April; pulled J.M. by the wrists and cursed at him during I.M.'s birthday celebration in May; punched J.M. in the chest at the front gate of Martin's property in May; abandoned I.M. in the parking lot on June 14; and tried to punch I.M.'s head and said he would "make [her] dead" in August. The children's therapist, Houghton, offered similar testimony regarding the children's reports of abuse. Meanwhile, the transcript reflects that the children's on-camera accusations were often uttered quickly during the frenzy of the exchanges and did not add any new details about the alleged abuse that were not already established through the admitted testimony. If

clip starts within a longer video), "Clip Length" (in minutes and seconds), and "Speaker Key" (initials for each of the persons shown in the clip). Below this is a transcription of the statements made in the recordings, with each statement attributed to the initials of a speaker. We will assume, for the sake of argument, that the transcript is accurate. Notably, however, it is not clear from the transcript, briefing, or record whether the dash cam was dual-facing, or whether it was positioned to record the front of the vehicle or its interior.

anything, Malinowski's and Houghton's testimony about the children's reports were far more detailed than what the children said in the videos.

Additionally, we cannot ignore that the children's on-camera accusations were hearsay to the extent they were offered to prove the truth of the matters asserted by the children. (Evid. Code, § 1200.) Malinowski does not argue that any hearsay exception applies, and on the present record, the trial court could have validly concluded that none did.[11] The on-camera statements were not made close in time to the described events so as to qualify as either contemporaneous statements (Evid. Code, § 1241) or spontaneous utterances made under the stress of excitement and without deliberation or reflection (*id.*, § 1240; *People v. Lozano* (2024) 101 Cal.App.5th 366, 376).[12]

Nor do other hearsay exceptions appear applicable. The child abuse hearsay exception under Evidence Code section 1253 applies to statements made for purposes of medical diagnosis or treatment, while the exception for nonmedical statements by a child under the age of 12 describing abuse or neglect applies only in criminal prosecutions. (Evid. Code, § 1360, subd. (a).) The judicially-articulated hearsay exception of *In re Cindy L.* (1997) 17 Cal.4th 15 applies to out-of-court statements of children "subject to juvenile

---

[11] Martin preserved a hearsay objection to the children's out-of-court statements through his motion in limine no. 6. The trial court reserved decision on that motion and would have likely had to confront the hearsay question head-on had the court not excluded the dash cam footage on Privacy Act grounds.

[12] The videos depicting the children's accusations of abuse were recorded anywhere from three days to more than a month after the alleged incidents of abuse.

dependency hearings"[13] and requires that the statements "show particular indicia of reliability." (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1231.) This case presents none of the requisite circumstances justifying application of these exceptions.

But even if we were to overlook this problematic hearsay issue and accept the possibility that seeing and hearing the accusations of abuse directly from the children might have some independent probative value, we nevertheless arrive at the same conclusion of harmless error. In light of the entire record, including the trial court's credibility and other express and implied findings, we are not convinced the admission of the dash cam videos would in reasonable probability have led the court to issue a DVRO protecting the children.

There was ample evidence suggesting the children were prone to making unreliable and exaggerated statements, possibly spurred on by Malinowski and Grandfather.[14] Both Espinoza and Martin testified the

---

[13]   There were several child protective services referrals made during the events of this case. One was by a staff member at J.M.'s school after he reported that Martin punched his chest and cursed at him. Houghton made several referrals, and Espinoza made one referral on June 14, 2021, due to the children's "story about dad hitting [J.M.]." However, Espinoza clarified to the child protective services worker that it was actually I.M. who had hit J.M. on June 10, 2021. Although the record does not disclose the outcome of these reports, Malinowski testified that she never received any correspondence from a child welfare agency indicating that it was following up on the referrals or opening a case file.

[14]   Substantial evidence supports the trial court's express finding that Malinowski and Grandfather erected "roadblocks" to successful exchanges. Espinoza testified before Judge Dabel that the children said their mother told them they could not go on visits, giving rise to Judge Dabel's "deep suspicion" that Malinowski was not encouraging visits. At the second DVPA trial, Espinoza noted that Grandfather's tendency to linger at the parking lot made the children more agitated and disruptive. In Espinoza's view, the children

23

children struggled with telling the truth, and the evidence bore this out. For instance, Espinoza testified that I.M. once stated, " 'Daddy hit me and killed me today.' " She also made statements about what occurred on visits she did not personally attend, giving Espinoza the impression that "somebody was discussing what happened on the visits and telling her . . . different situations." Espinoza further noted that I.M. "would turn on the tears and off the tears at will; so it was really hard to determine her level of distress." As for J.M., the evidence at trial included a June 2021 police report based on a child protective services referral that J.M. tried to explain a bruise on his chest by claiming "his sister hit him," and then "changed his story and said he fell. Moments later J.M. changed his story again" and said that his mother, father and Grandfather "all hit him 100 times each." In another instance, J.M. accused Martin of hitting him "tomorrow." Given the questionable reliability of the children's statements, it is unlikely the children's on-camera accusations would have lent more credibility to the

arrived at the exchange with "an agenda," which was "[t]o not go on the visit," and "[t]o cause chaos in the exchange, to be disruptive." Espinoza testified, for example, that on April 19, 2021—the day a private investigator was surveilling the exchange—the children were acting out more than usual, and that J.M. told Espinoza " 'Mommy said not to go,' " while I.M. reported that " 'Mommy says that we're going to drown' " if they went swimming in Martin's pool. On another occasion, after I.M. threatened to make herself throw up and urinated on herself, Grandfather ended the exchange, and I.M. then "looked over her shoulder at [Espinoza] and flashe[d] [Espinoza] a big smile." In May 2021, the children stated that Malinowski had told them to hit Martin. I.M. further said, " 'I like to pee in my pants because that means I don't go,' " and told J.M. "if they pee their pants they don't have to go." Espinoza's belief in the children's "agenda" was reinforced by the fact that they seemed to be agitated only during the exchange, but then they would generally return from visits they attended calm and happy.

24

reports of abuse that Malinowski and Houghton recounted, which the trial court evidently rejected.

In sum, the video evidence of the children's on-camera accusations against Martin constituted hearsay without an applicable exception; was cumulative to other more detailed evidence admitted at trial; and, in any event, was lacking in sufficient indicia of reliability.  As such, it is not reasonably probable that the admission of these videos at trial would have led to a different outcome in this case.

### b. Videos of Alleged Abuse

As for the video evidence purporting to depict alleged abuse by Martin, we likewise conclude the exclusion of this evidence was harmless.

We begin with the video of the exchange on June 14, 2021, which, according to Malinowski, depicted Martin's "abandonment of [I.M.] in a busy parking lot."  As Espinoza recounted during her testimony, the June 14 exchange was an especially difficult one due to the children's behavior. Espinoza, an experienced visitation provider, described it as "disheartening" and "utter chaos" and testified she "couldn't believe there was so much venom coming from such small children."  The exchange ended with Martin putting J.M. in his vehicle and driving away without I.M.

This was not, however, the first time Martin took J.M. on the visit and left I.M. behind; it had happened several times before when I.M. persisted in refusing to go.  Moreover, the transcript does not indicate that Martin left I.M. wandering in the parking lot, and Espinoza's written report of the June 14 exchange as well as her trial testimony reflected that I.M. was still in the car when Martin drove off and Espinoza arrived back at the exchange site. I.M. exited the vehicle around the time Grandfather was arriving from across

the street. Nothing in the transcript of the June 14 video purports to dispute Espinoza's testimony in these important particulars.[15]

We acknowledge there is some uncertainty as to how long I.M. was left alone in the car, whether Martin drove off before Espinoza returned to the exchange spot, and if so, how much time had elapsed in between. (The clip of the entire incident is 7 minutes, 12 seconds long.) But even if we assume for the sake of argument that Martin left I.M. in the car sooner than was prudent, he could still reasonably expect that Espinoza, who was supervising the exchange from 20 yards away, would quickly return to the exchange spot to secure I.M. Indeed, the record reflects that Martin signaled to Espinoza he was taking only J.M. on the visit before leaving the area, and that Espinoza arrived before I.M. exited the car. Based on a complete picture of the June 14 exchange, we cannot say it is reasonably probable the video footage would have led the trial court to find that Martin committed an act of abuse within the meaning of the DVPA and to issue a DVRO protecting the children.

The same goes for the videos of the fish and jail remarks, which were cumulative to the admitted testimony at trial. The threat to flush J.M.'s fish down the toilet was discussed during the testimony of Malinowski, Espinoza, and Martin. Likewise, these same witnesses testified as to Martin's statement to I.M. about jail for six-year-olds. The court impliedly found that neither of these statements rose to the level of abuse within the meaning of the DVPA, and we fail to see how anything depicted in the videos of these incidents would have led to a different result.

---

[15] Malinowski appears to concede as much in her opening brief, stating Martin "drove away, abandoning [I.M.] *in the car* in the parking lot where the exchanges occurred." (Italics added.)

26

Malinowski insists the dash cam footage would have provided grounds to impeach both Espinoza and Martin. (See *People v. Crow* (1994) 28 Cal.App.4th 440, 452 [evidence of confidential communications obtained in violation of Penal Code section 632 can be used to impeach inconsistent testimony by those seeking to exclude the evidence]; *Frio*, *supra*, 203 Cal.App.3d at p. 1497 [Penal Code section 632 "cannot be construed so as to confer upon a testifying witness the right to commit perjury"].) In one of her lengthier arguments on this score, Malinowski accuses Espinoza of committing perjury by falsely testifying that Martin told the children he was merely joking about flushing J.M.'s fish down the toilet when, in fact, the video shows that Martin never characterized his remark as a joke.

We conclude Malinowski fails to provide an adequate record to demonstrate the falsity of Espinoza's testimony. Although Malinowski's counsel insisted the videos were complete and unedited, it is clear from the face of the transcript that each clip was taken from a longer video. The transcript of the fish remark indicates that it took place on May 24, 2021, and the start time for the two-minute long clip is "0:09:46." The very next entry in the transcript describes another incident on the *same* day, just a few minutes later at "0:13:40." This means there were approximately two minutes in between the end of the first clip and the start of the next one that are not accounted for in the transcript. Malinowski cannot, on this incomplete and selectively edited record, demonstrate that Martin *never* told the children his remark was merely a joke.[16]

_____

[16] For that matter, the trial court's prescient concerns about the completeness of the videos, along with its finding that the admission of the videos would involve an undue consumption of the court's time, provided a separate and independent basis for excluding the video evidence pursuant to Evidence Code section 352, one that Malinowski leaves unchallenged in this

27

In another example, Malinowski argues the video taken on June 14, 2021, would have shown that Martin was lying when he "denied" being confronted by the children about punching J.M. But this argument is based on a flawed recitation of the record. In the cited portion of his testimony, Martin did not deny that the children accused him of punching J.M. He was asked, "You heard testimony about the children's accusing you of punching [J.M.] by the gate your estate; right?" Martin responded, "I heard your false allegations, yes. [¶] Q. You heard [I.M.]'s false allegations? A. I've heard everybody's false allegations about these events, yes." In other words, Martin did not deny being confronted with the allegations, either on June 14, 2021, or at any other time; rather, he affirmed he had heard the allegations but claimed they were false. Accordingly, the June 14 video showing I.M. confronting Martin about punching J.M. would not have contradicted his cited testimony.

Malinowski further argues the June 14 video "exposes instances of perjury" and reveals that Espinoza "falsely claims to have witnessed [I.M.] punching [J.M.]'s chest." This argument, too, falters on Malinowski's mischaracterization of the record. It is true the transcript of the June 14 video depicts Espinoza trying to persuade J.M. that it was I.M., not Martin, who struck him in the chest, but Malinowski assumes (wrongly) that Espinoza was referring to an alleged incident on May 13, 2021, at the gate of Martin's residence that Espinoza was not in attendance to witness. In context, however, Espinoza was referring to an incident that occurred during an exchange on June 10, 2021. As Espinoza testified, on June 10, she was

appeal. (See *Goncharov v. Uber Technologies, Inc.* (2018) 19 Cal.App.5th 1157, 1167, fn. 8 [issue not briefed is forfeited]; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631–632 [trial court's ruling is presumed correct and burden is on appellant to demonstrate error].)

sitting on a set of steps waiting for Martin to arrive when J.M. came over to her crying, saying "[I.M.] kicked him." J.M. was crying "[p]retty hard" and rubbing the area "just below the rib cage."[17] Four days later, at the June 14 exchange, I.M. claimed it was Martin who hit J.M. She told Espinoza, " 'Mommy saw you lift up [J.M.'s] shirt to see where the hit was, but I didn't hit [J.M.]. Daddy did,' " whereupon Espinoza and Martin "both tried to explain to [I.M.] that is not what happened." In other words, the June 14 video does not show Espinoza making a false statement about the May 13 incident at Martin's residence; rather, it shows her trying to correct I.M.'s statement about the June 10 incident that Espinoza had witnessed.

Malinowski makes several more unpersuasive arguments along these lines. Suffice it to say, either they are based on an incomplete record and Malinowski's self-interested interpretations of the trial testimony, or they go to the weight of the testimony and not whether the witnesses gave demonstrably false testimony.[18] In short, we remain unconvinced of the

---

[17] Malinowski's transcript of June 10 exchange reflects that Martin admonished I.M. for kicking J.M. in the chest, and that I.M. did not deny the charge at the time, instead stating, "I am going to kick you hard."

[18] For instance, Malinowski argues it was false for Espinoza to testify that her reports were truthful and complete because the dash cam videos would have shown that she did not report incidents such as Martin's jail remark or his "admission" that he "wasn't even there" when J.M. suffered the concussion. But Espinoza's failure to document these events and her characterization of her reports as complete goes to the weight of her testimony. In another example, Malinowski contends Martin committed perjury by testifying he and J.M. had an "agreement" about feeding the fish, as the dash cam recording shows "no deal whatsoever." Once again, the incompleteness of the video footage precludes Malinowski from demonstrating that Martin never mentioned an agreement with J.M. Moreover, Martin did not testify that he explicitly mentioned an agreement with J.M., and when pressed to answer whether he referenced J.M. "holding up his end of the agreement in those words," Martin said that he could not

reasonable probability that Malinowski would have successfully impeached Espinoza and Martin in any material respect using the dash cam footage.

Finally, we observe that several of the videos described in the transcript purport to depict the children crying and complaining about not wanting to go on visits, and Espinoza responding with comments like, "you can just sit in the car, and get hot, and melt," or in another instance, dismissing the children's conduct as "fake crying" and remarking, "See . . . my heart is hard and cold. The tears don't bother me." (Boldface omitted.) In one instance, Grandfather said that J.M. was choking, and Espinoza responded, "He is fine." (Boldface omitted.) It goes without saying that the written transcript is incapable of conveying the actual condition of the children, as well as the tone and tenor of the conversations; but it is of no ultimate matter. Though these videos may have shown the children in distress, they did not depict abuse by Martin within the meaning of the DVPA or otherwise provide a basis to impeach his or Espinoza's credibility. That the children sometimes sat for long periods of time in the car during attempted exchanges was attributable in no small part to their own behavior, which the court found (and substantial evidence showed) was encouraged by Malinowski and Grandfather in order to thwart visitation. We find no reasonable probability that the video evidence of the children's distress would have led to a different outcome in this case.

---

recall whether he did. Malinowski further contends the dash cam evidence would have shown that Martin's jail comment to I.M. was not, as he testified, an effort to make the children show respect but "was just another part of his pattern of threats." Reasonably construed, however, Martin's testimony simply went to the intentions behind his jail remark. Even if Martin did not express these intentions on video, we are not convinced the footage would have changed the court's view of Martin's testimony and this incident in any material respect.

In sum, we conclude the trial court's erroneous exclusion of the dash cam footage was harmless.

## B. Preclusion of Houghton's Expert Testimony

### 1. *Additional Background Facts*

After the children's therapist, Houghton, was sworn in, Malinowski's counsel informed the trial court Houghton would testify in part as an expert. The court inquired whether Houghton had been disclosed as an expert witness, and Martin's counsel responded that she had not. Malinowski's counsel explained that Houghton would offer testimony regarding statements made by the children during therapy sessions as well as her observations of them, to which the court responded, "She is not an expert in regards to domestic violence, and you don't need to designate her as an expert in regards to the testimony that you anticipate to elicit that you just represented to the Court. [¶] So, again, you can elicit a brief foundation in regards to her training and experience in regards to the role that she played in regards to these children, but she's not going to be designated as an expert because it's not a custody hearing and it's up to the court to determine whether or not [domestic violence] occurred."

Houghton then testified as to her education and licensing in the fields of nursing; marriage, family and child therapy; and the law. She also testified that in the dissolution case, Judge Dabel had qualified her as an expert in " 'marriage and family therapy, therapy for children, therapy concerning families that are experiencing trauma, and functional family therapy.' "

Houghton further testified that she spent approximately 60 hours in therapy with the children. She discussed many of the children's reports of abuse by Martin, the emotional effects of these incidents, and the emergency

therapy sessions that were held after various visits with Martin. According to Houghton, J.M. was "[e]xtremely distraught" after Martin threatened to flush his fish down the toilet, and I.M. was very scared by Martin's remark about jail for six-year-olds. The children were also very distraught after the June 14, 2021, exchange when Martin took J.M. on the visit and left I.M. I.M. was also "very scared" and described having nightmares after Martin threatened to punch her head.

Houghton further testified that the children's reports "kept coming up," with "the story remain[ing] the same." In her view, "the way the children perseverate in a story over time and independently, individually, with both of them together, then when I asked Mother to come into the room to, you know, be part of the demonstration and to hear the story, and then what the mother independently reports to me about what the children have said to her, when all of those match, there's a convergence of data that makes me take that very seriously."

Malinowski's counsel later revisited the issue of Houghton's expert testimony, arguing there was no obligation to make an expert witness disclosure because there had never been a demand from Martin for expert information. Martin's counsel conceded "[t]here was no demand for expert witness, but on the witness list here, Ms. Houghton was designated solely to testify about, quote, 'abuse.' There was no indication on the witness list that she would be proffering an expert opinion or that she would be qualified as an expert. She is also the children's therapist . . . and the mother's therapist as a family therapist . . . , and offering an expert opinion when she also stands in that role of therapist would be contradictory. She can't testify as a percipient witness to abuse and then also take a step back and put on an expert hat and issue opinions thereof. So it's not disclosed as an expert, and

it would be inappropriate given the role that she has as the children's therapist."

The trial court stood by its previous order preventing Houghton from giving expert testimony.

### 2. *Analysis*

Malinowski contends the trial court erred in precluding Houghton from giving expert testimony due to Malinowski's failure to designate Houghton as an expert before trial. Malinowski claims she had no obligation under Code of Civil Procedure section 2034.260, subdivision (a), to exchange expert information, as this requirement is triggered by the timely service of a written demand for an exchange of expert information under Code of Civil Procedure section 2034.220, which Martin concededly never made. (See *Hirano v. Hirano* (2007) 158 Cal.App.4th 1, 6 [where no demand for exchange of expert witness information is made by any party, "no party is required to comply with the statutory exchange requirements."])[19]

We need not reach the merits of this procedural issue, as the record discloses an alternative (and valid) basis for the trial court's decision. Specifically, the court explained it would not allow Houghton to give expert testimony because she was not a domestic violence expert, and it was the court's role to determine whether or not domestic violence occurred. We find no abuse of discretion by the court in so concluding. (See *Du-All Safety, LLC*

---

[19] Malinowski makes a secondary argument that the trial court erred in not permitting Houghton to testify as to what she saw on the dash cam videos. For the same reasons discussed above, we see no resulting prejudice from this exclusionary ruling. Indeed, our discussion of the incompleteness of the videos is even more apt here, as Malinowski's counsel acknowledged that the videos sent to Houghton were comparatively more edited than the ones offered at trial.

*v. Superior Court* (2019) 34 Cal.App.5th 485, 494–495 [decision to exclude expert testimony reviewed for abuse of discretion].)

"[E]xpert witness testimony is admissible if it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Coulthard* (2023) 90 Cal.App.5th 743, 764–765.) Here, the trial court could reasonably conclude Houghton's expert testimony would not assist it in determining whether domestic violence occurred because Houghton was not a domestic violence expert.

That Houghton was previously qualified by Judge Dabel as a family therapy expert during the family court proceedings was not dispositive as to whether her testimony would assist the trial court in determining whether abuse had occurred. True, Houghton's testimony on the children's emotional distress was relevant to the determination of whether the children had experienced abuse within the meaning of the DVPA, e.g., a disturbance of their peace. (See § 6203, subd. (a)(3); *Nadkarni*, *supra*, 173 Cal.App.4th at p. 1497.) However, Houghton was already permitted to give ample testimony on that score. Moreover, any assumed error in precluding Houghton's expert testimony was not prejudicial, as the court's main criticism against Houghton for not having spoken to either Martin or Espinoza would have impacted her credibility as an expert witness as well. On this record, we cannot say the court prejudicially erred in excluding Houghton from testifying as an expert in these domestic violence proceedings.

### C. Espinoza's Credibility

Malinowski next contends the trial court abused its discretion by crediting Espinoza's testimony despite her "demonstrable lack of credibility." However, "[i]t is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We

34

have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 (*Casey D.*), disapproved on another ground in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.) This is because the "the trier of fact is in a superior position to observe the demeanor of witnesses" for purposes of determining their credibility. (*People v. Lindberg* (2008) 45 Cal.4th 1, 36.) On appeal, "[t]estimony may be rejected only when it is inherently improbable or incredible, i.e., ' "unbelievable per se," ' physically impossible or ' "wholly unacceptable to reasonable minds." ' " (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065, italics omitted (*Oldham*).) Malinowski fails to meet this high bar.

Malinowski's criticisms that Espinoza only vaguely recalled Martin's jail remark to I.M. and J.M.'s reaction to the fish remark go to the weight of Espinoza's testimony. They do not demonstrate her testimony was "inherently improbable or incredible" or " 'wholly unacceptable to reasonable minds.' " (*Oldham*, *supra*, 235 Cal.App.3d at p. 1065.)

Malinowski maintains that Espinoza's testimony about the June 14, 2021, exchange was contradicted Grandfather's testimony. But even if this were the case, we defer to the trial court's resolution of such conflicts in the evidence. (*Casey D.*, *supra*, 70 Cal.App.4th at pp. 52–53.)

Additionally, Malinowski attacks Espinoza for telling the children that I.M. was the one who hit J.M., claiming "[t]his deliberate misrepresentation and attempt to shift blame raise questions about Espinoza's integrity and impartiality in her role as an exchange supervisor." As we have already discussed, this argument is based on an incorrect assumption of the event to

which Espinoza was referring when she accused I.M. of hurting J.M. (See Discussion, *ante*, part A.5.b.)

Malinowski further accuses Espinoza of overstepping her role by telling I.M. that "the judge says she needs to go" on the visit with Martin. Malinowski claims this statement violated a court order prohibiting the parties from discussing the case with the children. At trial, Espinoza explained that she made this remark because "[t]here are times when we have to let children know that there are rules that are in place and that there are higher authorities that have implemented rules that need to be followed." Espinoza further "guess[ed]" that it was I.M. who "referenced the judge first" and that she (Espinoza) "would not most likely have referenced the judge without that." There is nothing inherently unbelievable about this testimony. As before, Malinowski's criticisms go to the weight of Espinoza's testimony.

Finally, we highlight one particular argument by Malinowski that not only lacks merit but is based on a troubling misstatement of the record. According to Malinowski, Espinoza "initially denied" that I.M. climbed on top of a vehicle during the exchange on April 19, 2021, and when later "confronted" with Jorgenson's testimony and evidence that I.M. climbed on top of an SUV, Espinoza then "stated that while a little girl climbing on top of an SUV is a 'dramatic event' she purposefully excluded the incident from her visitation report because [I.M.] *repeatedly* climbed on top of the SUV and . . . according to Espinoza, [I.M.] is 'a good climber.' " According to Malinowski, nowhere in Espinoza's hundreds of pages of visitation reports did Espinoza ever report that I.M. had ever climbed on top of an SUV, and furthermore, Martin claimed the April 19 exchange was the first time I.M. had done so.

There are several critical inaccuracies in this argument. First, Espinoza never "denied" that I.M. climbed on top of a vehicle during the April 19 exchange. As the trial transcript reflects, Espinoza's first day of testimony was interrupted to accommodate Jorgensen's testimony, and prior to the interruption, Espinoza had not yet testified about the April 19 exchange. It was not until the following day during cross-examination that Espinoza was asked about I.M. climbing on top of a vehicle during the April 19 exchange. Espinoza explained she was not too concerned about I.M.'s safety during this incident because I.M. "was a very good climber, and I watched the children climb *rocks and trees* all the time." (Italics added.) At no time did Espinoza testify that she had seen I.M. repeatedly climb "on top of the SUV" as Malinowski maintains. In short, Espinoza never denied the climbing incident or backtracked on her testimony after being confronted by Jorgensen's evidence. Nor was her testimony contradicted by Martin's testimony that the April 19 exchange was the first time I.M. climbed onto a vehicle. The irony is not lost on this court that Malinowski's attempt to discredit the witness is based on her own distortion of the witness's testimony.

**D. Remaining Arguments**

Malinowski claims the trial court violated the DVPA's mandate to consider the totality of the circumstances (§ 6301, subd. (c)) by refusing to admit testimony about Martin's prior domestic violence against her, the children, and Grandfather, and unduly limiting the evidence to what was alleged in the latest DPVA petition. We are not persuaded.

The ruling in question was in response to Martin's motion in limine no. 1, which sought to exclude evidence of prior allegations of domestic violence. The argument was based on Malinowski's amended witness list, which went beyond the three witnesses Malinowski had initially identified

37

and added several more who, according to Martin, were not privy to the supervised exchanges, and whose testimony would involve an undue use of time. The court ruled it would permit counsel to make arguments about prior restraining orders issued against Martin but would not allow "testimony or evidence in regards to the previous domestic violence that led to those orders." The court's ruling was not an erroneous refusal to consider the totality of the circumstances, as the court permitted the relevant facts to come in through argument, while reasonably barring relitigation of prior domestic violence allegations that had already been examined and adjudicated.

Malinowski next argues the trial court improperly relied on incorrect facts and made findings that were unsupported by substantial evidence. First, she claims the trial court wrongly characterized the second DVPA petition as a request to add the children to the existing DVRO rather than a request for a new DVRO based on new allegations of abuse. Belying her claim of error is the following testimony from the trial: "[Q.] Ms. Malinowski, on page 1 of your declaration—and this is the declaration that you filed on September 14th, 2021—you said that you filed it to *add the children as protected parties*—correct?—that was your goal?" (Italics added.) Malinowski responded, "Yes." Malinowski does not address this portion of her testimony, nor does she identify any prejudice resulting from the claimed error.

Malinowski next claims the trial court erred in relying on the family court's prior finding of Espinoza's credibility in "March 2021," as the March 2021 hearing preceded the allegations of abuse in Malinowski's second DVPA petition. It appears the trial court's reference to "March 2021" was a typographical error, and we may reasonably presume the court intended to

38

refer to the July 2021 family court hearing during which Espinoza testified about many of the same instances of alleged abuse raised in this case. Moreover, notwithstanding the typographical error, the court independently found Espinoza to be a credible witness based on its own observations of Espinoza's testimony at the second DVPA trial.

Malinowski argues that at the July 2021 family court hearing, Judge Dabel did not address her claim regarding the falsity of Espinoza's reports and did not permit her or Houghton to testify or present evidence of alleged child abuse. We fail to understand how Malinowski's belated attacks on the family court's rulings in July 2021 impact this appeal, which arises from the second DVPA trial during which Malinowski and Houghton both testified, and Malinowski's allegations of Martin's child abuse were fully tried.

Finally, Malinowski argues it was improper for the trial court to admit and implement the custody evaluation from the dissolution case because Dr. Press refused to consider the new evidence of child abuse, including the dash cam recordings. We conclude Malinowski fails to provide an adequate record for review of this alleged error, as the custody evaluation is not in the record before us.[20] (*Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435 [appellant has affirmative duty to show error by adequate record].)[21]

## DISPOSITION

The judgment is affirmed. Martin is entitled to his costs on appeal.

---

[20] The record contains only a proof of service from Dr. Press stating that she served the custody evaluation report by mail on February 23, 2022.

[21] During the appeal, Malinowski filed two motions seeking amendments to her prayer for relief and asking the court to take new evidence, make factual findings, and issue various orders, including an award of attorney fees and the disqualification of the trial court judge. We deferred consideration of the motions until the merits of the appeal and now deny them.

39

_____
Fujisaki, Acting P. J.

WE CONCUR:


_____
Petrou, J.


_____
Rodríguez, J.

Trial Court:        San Mateo County Superior Court

Trial Judge:        Hon. Rachel Holt

Counsel:        Kamila Malinowski, in pro. per., for Petitioner and
Appellant

No appearance for Defendant and Respondent

*Malinowski v. Martin* (A167187)